Ms. Skelton. Good morning, your honor. May it please the court. Good to have you here. Thank you very much, your honor. Always a pleasure to be here. As Mr. Giddins himself said during the interrogation, he faced a dilemma. Should he waive his Fifth Amendment privilege against self-incrimination and get his most valuable asset back from the police, or should he abandon his property and exercise his rights? Before the police even began giving him Miranda warnings, they made him think that answering the questions was the procedure to get his car back. They made him believe that he would actually get his car back, and they prevented him from accurately assessing the consequences of waiving his privilege. So does that mean you agree that Mr. Giddins could have gotten up and walked out whenever he wanted to? He could not have. There's no question that he was in custody in this situation. The police had already gotten an arrest warrant before they tricked him into coming to the police station. Didn't they tell him at some point on the videotape he was free to go? But that was a lie because, in fact, they had in hand an arrest warrant. Who had the warrant? I'm sorry? Who had the warrant? Detective Taylor. Did he pop it? It was, I don't know that it was in his pocket or in his folder, but he had it. He had already obtained it. In that instance, the police, in fact, had a professional obligation to arrest him. They could not let him go. They tried to create atmospherics to make it appear to him. Is that warrant in the appendix here? The warrant is not in the appendix. However, Detective Taylor, when he testified during the trial, did testify that he already had the warrant in hand. And the government has conceded all along that the warrant was already signed in the operative before Mr. Giddens even came to the police station. Do you know what the warrant charged him with? The warrant charged him with the bank robberies. You know what strikes me about the interrogation is that every time, for example, about the free issue, you're not being interrogated. You're free and stop safe. And several times during the interrogation, the subject is changed on Mr. Giddens. Is that your understanding of that tape? They do go back and forth. I will say that from the very beginning, however, the misinformation was front and center. The police at a different detective, the main detective is Detective Taylor. The very first one specifically said, you're here to get your car back, right? Okay, yes. Let's start. Let's answer the questions. Mr. Giddens then asked that person, am I in trouble? No. That is, that's on page three of the transcript of the interrogation. And then later on, when Detective Taylor takes over, before he begins the Miranda warnings, this is on the bottom of page eight. He says, it doesn't mean you're under arrest. It doesn't mean you're being charged with anything. We, of course, know he has, in fact, been charged with something at that point. And then repeatedly, in the face of questions, the police. But he says you weren't under arrest. What's your point? He had to be under arrest before he left. That's right. There was no leaving that police station. Did the policeman have any discretion on whether to arrest him or not? I don't believe he did. I don't believe that at that point the police could have let him go. Well, there are lots of circumstances where the police may have a warrant and they decide not to serve it at a particular time because it serves their investigative purposes. Well, this is a situation that is not like they got a warrant and then waited to go to a home to execute it. Here was the individual in the actual police station. I believe there's an absolute administrative duty at this point to have a person in the face of it. Is there a statute or rule that establishes that or is that just your belief? I'm afraid I don't know of any statute or rule. Let me give you some language. The arrest warrant says to any authorized law enforcement officer, you are commanded in bold to arrest and bring before a United States magistrate judge without unnecessary delay Master Giddens. Correct. That's what it says. They would have violated that if they had let him go. They were under a duty. It says that he's been accused by indictment. It was a bench warrant then. Correct. Issued after an indictment. It wasn't on the complaint. Grand jury had indicted him apparently from the face of this. That's correct. And so at this point to suggest that he wasn't in custody is to... Well, maybe they're right. He wasn't in custody. But your point is he had to be in custody. He had to be in custody. They had to be in custody. He wasn't going to go anywhere. Right. So Berkner... He couldn't leave because they had to execute the warrant. That's correct. But to be honest, the custody, that aspect of this has to do with whether or not... You're also telling me he wasn't in any trouble? Yes. He said... Are they allowed to lie in a circumstance like that? I mean, they don't have to always answer every question accurately, do they, when they're interrogating somebody? So there's actually a difference between failing to affirmatively provide information. And this court, as well as the Supreme Court, has said repeatedly that there is no affirmative obligation before an interrogation begins to say, by the way, you're about to be arrested. However, where the courts have parted company with that particular approach, including this court, is if the defendant asks a direct question or if there is some kind of deception that misinforms the defendant or the suspect about the true nature of the interrogation. And here, that is exactly what happened. Detective Taylor explicitly said, you're not being charged with anything. And clearly... That was in response to what kind of a question? That was before there was any question whatsoever. This is at the bottom of the page. What about the question on the trouble? Am I in trouble? Then he said, no, not at this point, no. And the government said in its answering brief that if Mr. Giddens had said, am I about to be arrested, then Detective Taylor would have had an obligation to answer yes. That is putting a very fine point on what this question is. Am I in trouble, which he asks over and over again, is essentially the same thing. He was in trouble. There was an arrest warrant, and as you mentioned, Judge King, a bench warrant for him. There was no getting out of the trouble that he was in. It also is clear that apart from even the custody issue, going to purely voluntariness, that was really front and center in Mr. Giddens' thought process. He kept saying when Detective Taylor said, do you have any questions, yes, is this how I get my car back? Yes, we just need to ask these questions. But that's what I'm asking. Is this how I get my car back? Wait, am I in trouble? I don't know what you're asking me. Is this how I get my car back? You can see the thought process on whether he is making a knowing and intelligent waiver of his rights, and he's not. He's basing it on the misinformation that the police gave. Did you represent him in the lower court? I did not. My office did. You're with the Public Defender's Office? I am with the Public Defender's Office, but I only do the appeals there. I want to briefly mention that these questions were not booking questions. The government did raise that in both the district court and in its brief here. They were not booking questions. They were designed to elicit incriminating information, which, of course, is what happened. And even some of the information that might at first appear to be a booking question, like what was Mr. Giddens' cell phone number, was designed to elicit incriminating information. This actually dovetails with why this was not the constitutional error was not harmless. One of the things that Detective Taylor testified during trial was that after he got the cell phone number, he then got a court order for the cell site location information. So that was one of the fruits of this interrogation. I know that I have argued that that court order violates the Fourth Amendment. We will move – I'm not going to address that any further with you, but it does show – You decided that issue last spring. But the government harped on it during closing. They went over it over and over again, called it scientific objective in contrast to the other evidence, which was essentially very biased testimony from a cooperating defendant who had received a no-jail state disposition instead of a federal conviction. So they really needed this interrogation in order to bolster their case, as you can see from their closing argument. Independent of his responses at the interrogation, could they have proven their case? They had other evidence in the form of these cooperating witnesses. The government relied in its brief. They suggested there was a photograph from the first bank robbery and then cooperating witnesses. But, of course, he was also charged with conspiracy. Was the photograph introduced into evidence and presented? Is this a jury trial? It was a jury trial. The photograph was introduced into evidence. So the jury saw it? The jury saw it. The photograph was a person wearing a disguise. They used the interrogation to contradict an alibi for that. They used the interrogation to bolster their cooperating witnesses. Was it his co-defendants? Did they testify against him? They did testify, but they all... Well, that was that big enough to convict him. Well, this Court shouldn't just look at was there other evidence. It's whether that interrogation had an impact on the verdict. Well, the test is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction, isn't it? That's correct. And the fact that the government relied on this video so extensively during closing arguments certainly means the government was asking for the jury to consider this. And there's every reason to believe, as a result, that it did have an impact. I know my time is ticking down. I would like to address whether Mr. Giddens was correctly classified as a career offender, if the Court doesn't have any other questions on the statement. I'm going to skip over the bank robbery for a moment, although if I have time I will go back to that issue, and I'm going to move straight to the first-degree assault and the fact that first-degree assault in Maryland does not have an element of violent force. This Court said in Torres-Miguel, which is directly on point, that causing injury is not the same thing as using force. Force is different from the result. Intending to cause injury is intending a certain result. Actually causing an injury is a result. That is not the force that is used. This Court said, of course, a crime may result in death or serious injury without involving the use of physical force. And, in fact, this Court said in Torres-Miguel that conflating use of force with the result of injury is a logical fallacy. This Court has said the same thing. That was because whatever state it was, California may be specifically provided for bodily injury as opposed to physical force. That's correct, and the Maryland statute is the same. The Maryland statute says the first element is committing a second-degree assault, which I think everyone agrees does not involve an element of force. And then the second of the two divisible elements is the intent to cause serious injury. So that is one of the elements in the Maryland first-degree assault statute. In United States v. Gomez, a case I mentioned in my reply brief, this Court addressed a child abuse statute also from Maryland and whether causing injury to a child involved an element of force. And this Court said no. So that is a consistent theme throughout the circuits that is absolutely logical and where the courts have consistently gone. Torres-Miguel also made the point that the drafters of the guidelines themselves understood this difference between force and injury, that they have periodically revised the guidelines to account for that difference. So, for example, Torres-Miguel describes how in 1989 the drafters of the guidelines broadened the career offender definition to require only injury, not force, but recently they switched back to redefine the career offender crime of violence back to force in the same way that it is used in the Armed Career Criminal Act. Torres-Miguel is still binding precedent. The government has suggested that the Supreme Court case of Castleman has overruled it. That is not the case. First of all, this Court in McNeil cast doubt on that government argument, saying that they thought that was a dubious proposition. The decision in Castleman, Justice Sotomayor. They reserved the question, I think. They did explicitly say that they were not reaching that issue. They said it more than once, and they also said over and over throughout Castleman that the definition of violence in a domestic violence situation is necessarily broader than violence in the Armed Career Criminal Act. So they were very clear that they were using a different definition of force, and they did reserve deciding it. So Castleman hasn't decided it in the Supreme Court. It may be an open question, but it is not an open question in this Court. This Court is still bound by Torres-Miguel. I'd like to, in 21 seconds, mention that McNeil, this Court's decision on whether bank robbery is a crime of violence for 924C, does not actually resolve the issue before this Court, and that is because there is an operative difference between the two force clauses. One in the 924C case includes force against property. The career offender force clause does not. If the Court doesn't have any questions, I will reserve my time. Thank you very much. Mr. Clark? Good to have you here. Good morning, Your Honors. Thank you for having me. May it please the Court, my name is Kenneth Clark, and I represent the United States in this case. Now, the government submits that the trial court did not err in admitting the defendant's statements at trial, and the alternative, the other arguments. So was Mr. Giddens free to go when he was told he was free to go, or were the police officers under an absolute duty to arrest him before he left? No, there was no absolute duty to arrest him before he left, I think. And I think the issue of custody really hinges on his, the reasonable person in his shoes' perception of the situation. Whether or not, for the purposes of custody, whether he was in custody, whether or not there was an arrest warrant is essentially irrelevant because he didn't know there was an arrest warrant. Was he in trouble? So I think what happened here is the officers conducting the investigation were actually quite careful about what they were saying. And so they had an arrest warrant. I don't think there's a duty for them to execute that arrest warrant. Well, it says on it, you're commanded to arrest him. That's what the order says. The arrest warrant is a court order. It does. Do you agree with that? I do agree with that. All right. And officers normally obey court order. Agreed. But was he in trouble? He asked if he was in trouble. Well, I think it depended on what happened during the interview. And the answer was no. The answer was no. It wasn't trouble. He was charged by the grand jury with bank robbery and conspiracy to commit bank robbery and aiding and abetting bank robbery. That sounds like a little bit of trouble. Well, I think it depends in terms of their responses. I know defense counsel, in order to make this situation involuntary, they have to establish some sort of falsehood, some sort of coercion. Well, the way the questions were answered and they kept it, it's all about the car. And objectively, don't you think that he felt he was not at liberty to terminate the interrogation? Because if he did, he wouldn't get the car. I don't think so, Your Honor. I think in respect to the car, at no point did they say they weren't going to give him his car back. In fact, even when they said, we'd like some answers to the questions, they say, before we return your car, I think the clear implication is that you're going to get your car. I just want to ask you some questions about this. So that means you've got to answer these questions before you get your car. No. They specifically also told him, you don't have to answer any questions if you don't want to. You don't have to talk to us. I don't think there was ever, I think they were very careful as part of this interview, they didn't at any point tell him that he wouldn't get his car back or that they were going to retain his car. So I respectfully just don't think in this situation they actually lied about his car at all. They were careful about it. I think the effect of that also is important. The statements about the car are only considered as part of the totality of the circumstances, Your Honors, and certainly there's no argument that the other aspects of this interview were voluntary. It was brief. He came in voluntarily. There was no use of force, nothing else. And in that context, they responded, I think, truthfully to what he said and said we'd like answers to some questions. Now, the car itself, there's no, I suppose the problem with the defense has in this case as it relates to the car is that there was no express condition unlike other cases where courts have found some retaining of property or loss of job or income to be an actual issue. Here there was no express condition, no indication that he wouldn't get his car back. And so it's simply not sufficient in any way to make his statement involuntary. Now, as it relates to the arrest and whether or not he was going to be under arrest, I do think there are a number of situations in the course of investigations where officers choose not to execute arrest warrants for a number of reasons. They could have had if they spoke with Mr. Giddens and he had told them. Did you put any evidence to this effect? Did you put a witness on to say that officers don't execute arrest warrants even though they have them in their pocket and the defendant sitting there? No, Your Honor, there was no hearing on that point. Okay, you're just speculating on that. Do you expect us to take judicial notice of that? No, Your Honor. The warrant says you commanded the arresting. That's what they all say. I mean, I looked it up. I had one of my law clerks go find it in the records. I didn't even bother to put it in the JA, but it does say that just like all of them. Yes, Your Honor. Arrest warrants say you were commanded, signed by a judge. Yes. In my experience, and I had quite a bit of it in criminal proceedings, is that officers execute them. They do what the warrant says, and they do it promptly. And I think there are still situations where they may not have done it. I think even if they met with Mr. Giddens. Bank robbers in particular probably. Bank robbers are dangerous. Agreed, Your Honor. They're dangerous. Yes, Your Honor. They carry guns and weapons. They don't walk away from officers once they get a warrant. I'm not saying that's generally how it works. There are situations where if they had interviewed him and he had presented to them a significant alibi where they might have addressed that before executing the arrest warrant, they could have had him cooperate against others and worked with them that way, and that would be a reason that officers sometimes don't execute arrest warrants. The point being is not that, I mean, there's no evidence in the record as to whether or not they were ultimately going to execute this arrest warrant. The fact is they had the arrest warrant for the purposes of custody. It doesn't affect the analysis because Mr. Giddens didn't know about it. And actually when he ended the interview, he said, I'm not under arrest. And the officer said, no, no, no, yes, you are. You're now under arrest. So clearly he didn't think he was under arrest. Look at the room he's in. One of the doors behind him is locked. Correct. They tell him that the other door is not locked. But at the same time, if he wanted to leave, he'd have to go through those two officers to get to that door. And the other thing is the cell phone. They kept moving that cell phone further and further away from him. So the perception is that he couldn't get his phone either. Well, I think it went, I think his phone actually went back and forth a little bit because he kept playing with it. But by the end, it was right in front of him. And, you know, in the context, when you're considering the context, certainly there was one door locked, there was one door open. You know, it was part of the court's finding, the lower court's finding, that this was, that he was not in custody. That was certainly significant, the fact that, you know, it was a short interview. I think the whole interaction lasted half an hour. There were no firearms, no threats, no physical action, nothing like that. It was generally cordial and conversational. There were large stretches where they're talking about Italian food and pizza and that sort of thing. And, you know, ultimately, I think when you consider the totality of the circumstances, it's certainly voluntary, even in light of what may have been Mr. Giddens' concerns about his car or what was going on. Now, in terms of his status and the arrest warrant. I think when you look at the cases addressing this sort of thing, the real touchstone of this is when police are somehow, you know, expressly misleading the defendant about the nature of their investigation. So I think a lot of the cases where there have been issues, there are things like parallel civil and criminal investigations where the police do something to indicate that this is really a civil matter and they're not criminal side. I think the defense cites a Kansas case where they indicated that the defendant didn't need their criminal attorney for the interview. Certainly that's a problem. Other cases similarly, I think, hold that where it's unclear to the defendant that this is the nature of this investigation is criminal, what exactly they're looking into. That's a problem. I think in this case, it's entirely clear that the detectives were never unclear about what they were looking at, why they wanted to talk to him, what the nature of the investigation was. Three of his friends were just arrested in his car. They're committing a bank robbery, and the detectives clearly said to him throughout, there was a robbery, we need to look into it, we need to look into what happened with his car, what happened with these girls, we would like you to tell us about that. So I think in that context, this situation is quite distinct from cases where there's been that sort of impermissible misunderstanding about the nature of the investigation. You also make the argument, at least in brief, that this is harmless error, if it is error. Why is that? So I have to respectfully disagree with defense counsel about the extent to which this statement was particularly highlighted or useful during the trial. Quite frankly, it wasn't a particularly meaningful interaction. This was not a situation where the statement involved some sort of... What statement did he use against you? I mean, they played the recorded interview. You played the whole interview? They played the whole interview. Okay. The only statements, the only things highlighted in closing about the interview at all were one, they referenced the fact that in the video he was playing with his phone to suggest that he kept his phone and would have had his phone. Were there any statements other than what we see in the video? No. No. So they highlight the one thing about him playing with the phone, and then they highlight that he said he would have been with his P.O. at the time of one of the robberies, and that was not accurate. And in the context of that, there's a whole back and forth about, you know, what week it is and what days he had off and he wasn't sure. And ultimately the evidence showed that he had been with the P.O., that he had been at the P.O.'s office the day before, not the day of the robbery. So those two points, it's fairly limited. And actually both of those points... So there was evidence introduced at the trial that impeached what he said on the video? So they called the parole officer just to say that he wasn't there the morning of the robbery. Now, on both of those particular points, there was actually other evidence introduced in the trial that addressed those. So tell us what the direct evidence was that you say establishes his guilt so that harmless error would apply. So as an initial matter, two co-conspirators testified against him. One, his longtime girlfriend who was involved in the robberies. She testified about his helping him get ready for the first robbery, dressing him up in women's clothes, getting him into a wig, loaning him some clothes, and then him telling her about the robbery that he had just committed later that day when he got back. Her testimony was significantly corroborated. There were things like she testified that he told her that he had thrown away the GPS pack from the money and, in fact, that pack was recovered by officers a few blocks away from the robbery. As I said, she talked about it. Did your girlfriend plead guilty and cooperate? That was part of her plea deal? She did, Your Honor. She pled guilty to a state robbery charge and agreed to cooperate. A state robbery charge? Yes, Your Honor. And agreed to cooperate and testified in this trial. Any other trials? No, I believe she just testified in this trial, Your Honor. All right. And another co-conspirator testified? There was another co-conspirator who was involved in the third robbery who also testified. Now, that co-conspirator knew Master Giddens and had interaction with him. She didn't have much interaction with him at all related to these robberies. Did he plead to? It was a she. She pled to, yes, Your Honor. She pled to? Yes. They both pled in state court? Yes, I believe so. Did they walk away? Get probation or something? I know the girlfriend got a suspended sentence, and I believe that the other individual got a similar result, but I don't, to be honest, I don't remember exactly what her. And the defendants argued that both of them were lying, I guess. Yes, Your Honor. And that's why I think one of the other points that was important at the trial was that they offered significant evidence of corroboration. So in addition to this testimony, they had the photo from the bank video of Mr. Giddens actually. All right. So who identified Mr. Giddens in the photograph? The girlfriend identified Mr. Giddens in the photograph, and the jury was able to look at the photograph itself. Now, he's wearing a wig, but I think there are features you can point out. They identified him as the fellow wearing the wig, or the person wearing the wig. Yes, and they had recovered the wig. The wig, they tested for DNA in addition to female DNA. It also had male DNA on it. Was the DNA tied to him? It wasn't insufficient to match up, but they were able to identify that one of the contributors to that DNA inside the wig was a man. A man. Was a man, which... Well, that didn't help you much. No, no. That, I think, corroborated what they were saying. There were also the bank teller testified that it was a man dressed as a woman who actually committed the robbery. The notes from the various robberies were... Did the teller identify him as the robber? No, the teller did not identify Mr. Giddens as the robber. The teller was able to... We knew it was a man dressed as a woman, but because of the disguise, the teller wasn't able to identify who it was. The robberies... There were other things like the robberies were conducted in Mr. Giddens' car. There were similar clothing. A similar bag was used at each of the robberies and other corroborative things. And ultimately, in light of all this evidence of his guilt, the statements, which really were not terribly significant and may have really sort of been an over-trying of the case, were not, I think, were harmless error, if they were errors. But they have to be harmless... Yes. ...in this context beyond a reasonable doubt. Yes, Your Honor. This is a constitutional error. Yes, Your Honor. It has to be harmless beyond a reasonable doubt. Yes. We have to be satisfied that it's harmless...  ...beyond a reasonable doubt because it involves a constitutional error, if there's an error. And I think that's why it's important. I think that's why it's important, not only that there's all this other evidence, but also that really the two points that were called out about this, his playing with the cell phone during the interview and then his claim about his location at the time of the robbery, were both addressed by other evidence. So the girlfriend testified about him having the phone and actually testified that specifically he had the phone the morning of the robbery. And then the cell site evidence that they obtained... Why did you all even use this, then? And, Your Honor, I wasn't on the trial. That's why we just thought you'd save yourself the possibility of having a problem on appeal... I... ...if you just circumscribed the case a little bit. And I didn't. I didn't try the case, so it may have been a little over-tried. That being said, having tried cases, I, you know, wouldn't fault them for not wanting to lose something. The prosecutors are entitled to over-try them if they want to. Isn't it true that as long as the officers and Mr. Giddings were talking about the car, getting the car back, and you're not in trouble, he kept talking? But as soon as they served him that arrest warrant, he exercised his right to remain silent, didn't he? Well, I think, actually, as soon as they... Once they confronted him with the picture, told him, you know, we think you're in the bank, he explained... He told them that wasn't the case and ultimately said, no more questions. Right. Yeah. And I think that goes to the fact that he, you know, he was aware of his rights. He was able to exercise them. I think that factors into the fact that this was a voluntary interaction and he was well enabled. I mean, it's in the sort of adversarial process of this interaction, I think. He was trying to, you know, see what he could find out about what was going on and then they were trying to do the same. So what was the purpose in using the video at the trial? Tell us what the purpose was of that. I can't get into sort of their minds as to what was going on at the time. I think by looking at their closing argument in terms of what they argued, it appears that ultimately they thought it was a fairly limited utility. I mean, there were the two points. He had that he played with his cell phone a lot during the interview and then that he said he was at his parole officers the morning of the robbery. Those are the points that they made in closing argument and that was the extent of it. Your Honor, I understand I just have about 30 seconds left if I could just respond on the point of first degree assault as it relates to a crime of violence. We certainly do contend that first degree assault. Are you willing to give up anything on that? No, Your Honor. We think that first degree assault is a crime of violence and we think that I think the crux of this is the interaction between the Torres-Miguel case and the Castleman case. And while I understand that the court in McNeil was certainly not inclined to find that Castleman fully overruled Torres-Miguel, we do think it's significantly limited. I see my time is out, Your Honor. So unless you have any questions, I'll... We appreciate it very much. Thank you very much, Your Honors. Thank you. Ms. Kelton. Thank you, Your Honor. I believe you were wondering what the government's purpose was in using this video at all. I think that actually if you look at the closing argument, you can see that they had a significant purpose. The teller was not able to identify the person who robbed the bank. The DNA was inconclusive. The cooperating defendants had substantial bias. They were caught red-handed. They were arrested immediately upon the completion of the final bank robbery. So they needed a story, and they also received no jail state dispositions. So how did the statements from the interview incriminate him? I mean, that's what you say maybe the case was a little bit weak, but it doesn't sound like his statements were very incriminating either. Well, they were. First of all, of course, he was charged with conspiracy. So all of the details about loaning his car to the other conspirators was essential to proving conspiracy. If you loan the car to the other people for the purpose of robbing a bank, he's guilty. That was the government's contention. And that would be right. That's correct. And you're saying that the statements buttressed that? Yes. So they were essential to the prosecution. They were essential to the prosecution. And if they're essential to the prosecution, I guess you'd say they can't be harmless beyond a reasonable doubt. Cannot be harmless beyond a reasonable doubt. Well, how did the statements – I mean, he said that he lent the car to these three people. But, I mean, what else did he say other than that that would go to his intent or show cognizance of what they were going to do? Well, part of that is his attempt to establish an alibi by saying that he was with his probation officer. Well, let's stick with the car for a minute. He says, yeah, I gave the car to whichever one of them it was. So other than acknowledging the fact that he lent his car out, what else is there about the car in the tape? That he regularly loaned it to his friends. How did they prove he loaned it to them for the purpose of robbing a bank? Well, that is where they used the statement as what they called corroboration of Ashley Fitz's testimony. They felt that her testimony needed substantial corroboration, and they kept referring – The girlfriend. The girlfriend. So I – Well, I mean, did your client deny at trial that he lent the car? My client did not present any evidence – He did not testify at trial. He did not testify, which is also part of why – The only thing that he said that got before the jury was what was said in this interview. Exactly. And the government also drew attention to his demeanor in the video. So it was more than simply his words. It was his demeanor. It was linking him up to how he was always with his phone. And, of course, there was the derivative evidence of the phone. I also want to just draw your attention – This is page three of the transcript of the interrogation on whether the detectives were careful about overstating their case. Okay. Let's see. You're here to – This is Detective Marano. You're here to get your car, right? Yeah. So basically, even if he didn't say, I am never giving you your car back, there was deception and trickery throughout that the procedure to get his car was that he had to answer the questions. This is – and the deception and trickery is part of what overcame Mr. Giddens' free will and prevented him from making a knowing and intelligent waiver of his privilege to remain silent. The government talked about the totality of the circumstances. Absolutely, the fact that there was no yelling was a circumstance. But the description – Mr. Giddens' own statements show that his perception of these circumstances was that he was not free to leave and that he did have to answer the questions. Thank you. Thank you, Ms. Skelton. We'll come down and greet counsel and then take a short break.
judges: Robert B. King, G. Steven Agee, Henry F. Floyd